UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA


MICHELLE NOGESS, ET AL.                           CIVIL ACTION

VERSUS                                             NUMBER: 16-15227
                                                    c/w 16-15234
POYDRAS CENTER, LLC, ET AL.                        SECTION: "A"(5)


## ORDER AND REASONS

There are currently two matters before the Court, both of which arise from the improper removal of this action by Defendant, Velocity Consulting, Inc. ("Velocity").  The first matter is Velocity's Motion for Leave to File Amended Notice of Removal (rec. doc. 38), which seeks to correct omissions in its original Notice of Removal (the "Notice").  (Rec. doc. 1).[1] That Motion and the hearing thereon have, in turn, precipitated the second matter currently before the Court, which is a Rule to Show Cause issued by the Court directing that Velocity and/or its counsel, Matthew J. Ungarino ("Ungarino"), David Bordelon ("Bordelon") and their firm, Ungarino & Eckert, L.L.C. ("U&E")(collectively the "Respondents"), show cause why they should not be assessed costs and/or fees or otherwise sanctioned under 28 U.S.C. §1447(c), 28 U.S.C. §1927, and/or Federal Rule of Civil Procedure 11, for the filing of the original improper Notice of Removal in this consolidated matter.  (Rec. doc. 48).

The Court has received briefing on both matters and has now held hearings on each. Based upon the submissions of the parties, the arguments of counsel at the hearings and the Court's review of the record of this case as well as the applicable law, the Court issues the

---

[1]  While there are actually two Notices of Removal at issue here because there were originally two separate state-court lawsuits, as the two cases have now been consolidated in this Court, the Court will refer herein to the singular "Notice" from the *Nogess* matter.

following ruling as to both the Motion for Leave to Amend and the Rule to Show Cause on possible sanctions.

## I.     THE RELEVANT PROCEDURAL HISTORY OF THE CASE

This case was filed in state court on February 10, 2016 against Poydras Center LLC; Poydras Center Manager, Inc. ("Poydras Defendants"); Bobby Schloegel; and the Travelers Casualty Company (collectively the "Original Defendants").[2]  (Rec. doc. 1-1 at p. 1).  The Original Defendants each answered the Petition and conducted discovery in the state-court proceeding.  (*Id.*).

On June 10, 2016, Plaintiff, Michelle Nogess, filed her First Supplemental and Amending Petition, adding Velocity and EMG Corporation ("EMG") as Defendants.  (Rec. doc. 1-1 at p. 31).  The Original Defendants answered that petition.  (*Id.* at 56).  After being served with process on September 13, 2016, Velocity removed the matter to this Court on October 5, 2016.  (Rec. doc. 1).[3]

On November 3, 2016, both Plaintiffs filed Motions to Remand, arguing in part that Velocity had failed to properly allege the citizenship of the Poydras LLC members under applicable United States Fifth Circuit precedent, rendering the Notice "defective on its face and making remand mandatory."  (Rec. doc. 16-1)(citing *Harvey v. Grey Wolf Drilling*, 542 F.3d 1077 (5th Cir. 2008)).[4]  Apparently recognizing that its Notice was, indeed, defective due to its failure to identify any members of Poydras LLC or to allege their citizenship, Velocity responded to these Motions to Remand in part by filing its Motion for Leave to File Amended

---

[2]  The member case, *Yates v. Poydras Center, LLC, et al*, was filed in state court on or about June 10, 2016.

[3]  The *Yates* matter was removed by Velocity that same day.  It was transferred to Judge Jay C. Zainey on October 26, 2016 and consolidated with the *Nogess* matter October 31, 2016.  (Rec. docs. 12, 16 in No. 16-CV-15234).

[4]  Plaintiffs also went on to address the fraudulent joinder argument raised by Velocity in its Notice.  That issue is not germane to the matter currently before the Court.

Notice of Removal, to specifically allege the identity and citizenship of each of the LLC members.  (Rec. doc. 38).[5]

Plaintiff, Michelle Nogess, filed an opposition to the Motion for Leave and the Court set the matter for hearing.  (Rec. docs. 42, 40).  Prior to that hearing, the District Judge stayed the outstanding Motions to Remand pending this Court's determination on Velocity's effort to amend the Notice.  (Rec. doc. 41).

## II.    THE HEARING ON VELOCITY'S MOTION

To fully understand the details and importance of the issues raised at the hearing on Velocity's motion *and* the follow-on hearing on the Rule to Show Cause, one must first understand the extraordinary and unfortunate personal jurisprudence that has developed over many years surrounding Ungarino's and U&E's history of improper removals.  The recitation of at least part of this history will provide necessary context for a discussion of the issues currently before this Court.

### A.    *Ungarino & Eckert's "Long Line of Fraudulent and Improper Removals"*

This case is not one involving an isolated improvident removal by a law firm that made a simple, one-time mistake or omission in its removal papers.  Rather, it is the latest in a "long line of fraudulent and improper removals that Ungarino & Eckert, and more specifically Matthew Ungarino, have filed in this and other districts."  *Hollier v. Willstaff Worldwide, Inc.*, No. 08-CV-1382, 2009 WL 256503 at *2 (W.D. La. Feb. 3, 2009)(Melancon,

---

[5] Velocity's initial effort to amend the Notice was deemed deficient and rejected by the Clerk's office for failing to indicate whether the motion was opposed.  It also filed a Motion for Summary Judgment, which was directed at the fraudulent joinder issue.  (Rec. doc. 20).  That Motion was stayed by the District Judge pending the outcome of the present Motion for Leave to Amend.  (Rec. doc. 41).

J.).  It was this history of improper removals that prompted the Court to order Ungarino to

appear at the December 21 hearing.

In *Hollier*, Judge Melancon, citing more than 20 separate cases involving improper

removals by Ungarino and his law firm, declared "[e]nough is enough." *Id.* at *2-3.[6]  Judge

Melancon found that "[a]s warnings and lesser sanctions in the past have failed to deter the

firm of Ungarino & Eckert from its vexatious practices, the Court is left to consider whether

a more major sanction is necessary to achieve the desired result." *Id.*  He granted Plaintiffs'

motion for attorneys' fees and costs under 28 U.S.C. § 1447(c) and set a rule to show cause

why the court:  (1) should not impose sanctions of at least $25,000 against U&E and (2)

---

[6]  Judge Melancon cited the following cases:  *Fontentot v. Granite State Insurance Company*, 2008 WL 4822283 (W.D. La. 11/3/08)(awarding $2,500 in attorneys' fees to plaintiff due to improper removal and firm's history); *Saxton v. Thomas*, 2007 WL 1115239 (W.D. La. 4/12/07)(noting that "[a]lmost every notice of removal filed by the firm in recent years has been defective for one reason or the other, with the most common problems being failure to meet the minimal requirements of pleading the parties' citizenship and failure to plead or point to facts adequate to satisfy the amount in controversy requirement," and awarding plaintiffs $1,000 in legal fees for the improper removal)(citing *McClelland v. A.I.G. Ins. Co. Inc.*, 02–CV–822; *Century Surety Co. v. Hays Brothers Angus Ranch*, 04–CV–0010; *West v. State Farm*, 03–CV–1118; *Jackson v. Braden*, 04–CV–0313; *Pinkney v. Family Dollar*, 04–CV–1175; *Folks v. Goforth*, 05–CV–0215; *Woods v. Eckerd*, 05–CV–704; *Shyne v. Ryan's Family Restaurant*, 05–CV–1190; *Evans v. Family Dollar*, 05–CV–1517; and *Atkinson v. Laich Industries Corp.*, 05–CV–966); *Saxon*, 2007 WL 1974914 at *5 (affirming a $1,000 award of attorneys' fees and costs to be paid by U&E to deter the "firm from continuing to file poorly prepared, defective notices of removal."); *George v. Dolgencorp, Inc.*, 2007 WL 4678577 at *2 (recommending sanctions because U&E continue to attempt to remove cases to this court relying on their boiler plate notice of removal form and no support for federal jurisdiction ..."); *George*, 2008 WL 103957 at *2 (declining to impose sanctions against the defendant's counsel, noting "the decision is a close one" and that "the Court's patience with mere conclusory allegations of jurisdiction from form removal documents, unsupported by any evidence outside the petition, is quickly running out"); *Hampton v. Fred's Stores of Louisiana*, 06–CV–721 (warning that "it is time for such poorly prepared notices of removals to stop" and that "future problems of this nature will be addressed in open court rather than through orders that spell out how to fix the mistakes counsel has made in a notice of removal" and that "the court will consider sanctions or other deterrents ..."); *Dailey v. Dollar General Stores*, 05–CV–1472 (remanding for lack of sufficient jurisdictional amount); *Miller v. Bolton*, 01–CV–799 (same); *Hebert v. Nationwide Mutual Insurance Co.*, 01–CV–367 (same); *Burgess v. Ryans Family Steakhouse, Inc.*, 07–CV–385 (same); *Edwards v. Fred's Inc.*, 05–CV–288 (same); *Keyser Avenue Properties, LLC v. Fred's Stores of Tennessee, Inc.*, 06–CV–2199 (same); *Gatlin v. Dolengencorp., Inc.*, 05–CV–2114 (same); *Murray v. Oliver*, 05–CV–1964 (same); *Guin v. Family Dollar Stores, Inc.*, 00–CV–657 (same); *Demette v. Telecable Associates*, 02–CV–737 (recommending remand for lack of sufficient jurisdictional amount, but case settled prior to remand); *Johnese v. Guideone Mutual Insurance Co.*, 05–CV–1039–D–M3 (M.D. La.)(remanding for lack of sufficient jurisdictional amount); *Nodier v. Ungarino & Eckert, LLC*, 04–895–D–M3 (M.D. La.)(noting that "this is the second instance of this defendant removing a case of this type to this court without any legal basis for doing so" and accordingly awarding $5,101.25 in attorneys' fees and $199.00 in costs for improvident removal, but denying Rule 11 sanctions warning that "any similar action in the future will trigger a cause for sanctions.").

4

should not recommend to the District Judges of the Western District of Louisiana that U&E be barred from practicing in the Western District. *Id.* at 3. Judge Melancon ordered U&E to file a brief explaining why these sanctions should not be ordered, which the firm did on March 2, 2009. (Rec. doc. 43 in No. 08-CV-1382).

Shortly after U&E's brief was filed in the *Hollier* case, another judge of the Western District of Louisiana issued an opinion finding that U&E had failed to properly allege the citizenship of its own client and allowing the firm additional time to amend its notice of removal in that case. *Tyler v. Granite State Ins. Co.*, No. 09-CV-8065, 2009 WL 799696 (W.D. La. March 25, 2009). In that case, Magistrate Judge Hornsby also cited his own previous decisions in which he issued orders to U&E that carefully spelled out the rules for alleging corporate citizenship because "[a]lmost every notice of removal filed by the firm in recent years has been defective for one reason or the other, with the most common problems being *failure to meet the minimal requirements of pleading the parties' citizenship* and failure to plead or point to facts adequate to satisfy the amount in controversy requirement." *Id.* at *1 (emphasis added).[7]

Magistrate Judge Hornsby ultimately declined to impose sanctions against U&E in *Tyler*, "trusting that Judge Melancon will have gained the firm's attention in *Hollier* when he put at issue the possibility that the members of the firm will be barred from practicing in the Western District of Louisiana." *Id.* Notably, he also pointed to the fact that the firm had recently filed a brief in *Hollier* in which it represented that it would conduct training in

---

[7] The cases cited by Judge Hornsby involving U&E included *Saxon*, 2007 WL 1115239 at *5 (W.D. La. 2007); *Jackson*, No. 04-CV-0313; *Pinkney*, No. 04-CV-1175; *Folks*, No. 05-CV-0215; *Woods v. Eckerd*, No. 05-CV-704 (court ordered defendant to amend notice of removal with respect to amount in controversy); *Shyne*, No. 05-CV-1190; *Evans*, 05-CV-1517; and *Atkinson*, No. 05-CV-966.

removal practice and would "form a committee of partners who will review any notice of removal before it is filed." *Id.* Judge Hornsby then expressed "the sincere wish of the court that the training and committee are successful . . . and end the firm's long history of filing deficient and time-wasting notices of removal." *Id.* at *2.

Thereafter in *Hollier*, Judge Melancon held a hearing on the rule to show cause, at which Ungarino apologized to the Court for his "improper removal" in that case, admitting that the "inquiry conducted into the jurisdictional facts set forth in the notice of removal was unreasonable." (Rec. doc. 51, p. 4 in No. 08-CV-1382). Ungarino also assured Judge Melancon that his firm had "undertaken significant remedial measures" to avoid future improvident removals, including hiring two law professors to conduct training on ethics and removal procedure and – most notably for purposes of this case – creating a "professional responsibility committee of equity partners who coordinate in-house ethics and removal training, review the form and content of all notices of removal and opposition to remand, and otherwise serve as a ready resource for ethics and removal issues." (*Id.* at pp. 5-6).

At the conclusion of the hearing, Judge Melancon found that Ungarino "failed to conduct a reasonable inquiry under the circumstances prior to the removal of this matter to federal court, as admitted here today by Mr. Ungarino, based on the record of the proceeding, as well as the filings that were made pursuant to the Court's order." (*Id.* at p. 7). In declining to bar U&E from practicing in the Western District, Judge Melancon made the following comments, germane to the present matter:

> I'm not sure why it took so long to learn the lesson, but I really
> do believe, from what you have said here today and what you
> did before you got here today, as far as trying to bring your firm
> up to snuff, that you obviously got it, and I believe that. If I didn't
> believe it, I wouldn't say it, and I might not do what I'm about to
> do. But because I do believe that, if there is a violation in the

> future – and again, I'm not – wouldn't want to deter you or anybody in your firm from zealously representing your clients' interests in the future to the full extent of your ability to do so – it would certainly be a very, very heavy price to pay for this judge, and I would suspect – again, not speaking for my colleagues at the district or magistrate judge level in the Western District. I suspect it would be a very, very, very heavy price to pay with them. So, again, you have got the tools. Your firm has gotten the tools to be able to dot your Is and cross your Ts and represent your clients to the fullest extent of the law consistent with whatever ethical obligations that good lawyers should use in their zealous representation of their client. So, like I say, it's a good thing, but it's a double-edged sword, and I'm sure you understand that. I trust that the other attorney in your firm understand that.

*Id.*

This Court reiterates at this point that the foregoing history is not cited as a cause for any sanction or discipline in this case but to provide necessary context to these proceedings. Had it not been for this history, for this "long line of fraudulent and improper removals," U&E would likely not have felt it necessary to create its "professional responsibility committee," the ostensible purpose of which is to avoid the exact situation now before the Court. The firm's extensive history and experience in initiating improper and/or premature removals and being repeatedly admonished for that conduct is also germane to the question whether, under Rule 11, Ungarino and Bordelon should be subject to sanctions for failing to conduct a reasonable inquiry into the facts supporting removal under Rule 11.

### B. The Hearing on Velocity's Motion

As noted, the hearing on Velocity's Motion to Amend initially went forward December 21, 2016. (Rec. doc. 48). In advance of that hearing, the Court issued an Order directing that Ungarino, as lead counsel and the attorney who signed the Notice, appear personally at the hearing. (Rec. doc. 43). In response to that Order, Ungarino wrote the Court (copying all

counsel of record), asking that he be excused from attending the hearing because, among other reasons, he had "no personal knowledge of the citizenship of the co-defendants' clients," despite having signed both the Notice and the proposed Amended Notice ("Amended Notice").  (Rec. doc. 47).  The Court declined that request.

At the December 21 hearing, the Court questioned Ungarino and Bordelon concerning the Notice and the shortcomings therein that prompted Velocity's Motion for Leave to Amend that Notice.  The Court noted U&E's well-established reputation for and history of premature and improper removals and the fact that this history had prompted the firm to create its "Professional Responsibility Committee" (the "Committee"), which is comprised of four equity partners who are said to review for form and content every notice of removal filed by the firm.  (Rec. doc. 53 at p. 6).

Upon questioning by the Court, Ungarino advised that the Committee still exists today, identified its members and stated that it had, indeed, reviewed the Notice in this case. (*Id.* at p. 7).  Ungarino was then asked by the Court whether the four equity partners on that Committee realized at the time the case was removed that there were material jurisdictional allegations missing from the Notice because there were LLCs involved as defendants in the case.  Ungarino responded, "No.  I had no knowledge as to any LLC or memberships – members that were missing."  (*Id.* at p. 7).  When asked in a follow-up question whether he and the Committee knew at the time of removal that established Fifth Circuit precedent holds that the citizenship of an LLC for diversity purposes is determined by the citizenship of all of its members, Ungarino stated "Yes, Judge, we knew that."  (*Id.*).

When the Court pressed Ungarino and Bordelon on why the firm removed the case without knowing the facts required to do so properly, it was met with two seemingly

inconsistent statements.  First, Ungarino insisted that his firm was asking for the information regarding members' citizenship "*way in advance*" from counsel for Poydras and they were not getting it – he even offered to submit emails and the firm's time sheets to prove they were "asking for the information and [] not getting it."  (*Id.* at pp. 10, 12).  Then, however, in his very next statement to the Court, Ungarino stated:  "Well, frankly, Judge, we were unaware that the LLC membership was a problem."  (*Id.*).  Then, finally, Ungarino admitted that "…to be fair, Judge, let's face it, we were focusing on the individual, right?"  (*Id.*).

Taking these last two statements as possible admissions that the Committee was unaware of the necessity of alleging the identity and citizenship of the LLC members at the time of removal, despite Ungarino's assurances otherwise, the Court became concerned that Ungarino's earlier statements to the Court that the firm had been trying without success to obtain the necessary information from co-defense counsel were not true, *i.e.*, why would they be asking for information they didn't know they needed?  For that reason, the Court set the aforementioned Rule to Show Cause and ordered both U&E and counsel for Poydras LLC to separately produce for *in camera* inspection the following:

> copies of all emails or other written communications that were exchanged between them and counsel for the Poydras LLC defendants in connection with the drafting of the original notice of removal and the proposed amended notice of removal, including all efforts to ascertain jurisdictional facts pertaining to the members of each LLC.

(Rec. doc. 48).

Upon being told in open court that the foregoing Rule to Show Cause would be set, Ungarino asked that it be sealed and stated repeatedly that he believed it was unfair for the Court to issue the Rule before reviewing the aforementioned documents.  (Rec. doc. 53 at pp. 19-21).  The Court declined his request.

9

The Court also deferred ruling on the merits of the Motion for Leave to Amend the Notice, at the suggestion of Plaintiffs' counsel, who argued that, should the Court's review of the aforementioned documents reveal that U&E had *not* actually requested the LLC members' citizenship information until after the motions to remand were filed, there may be additional grounds to deny Velocity's request to amend the Notice.  (*Id.* at pp. 22-28).

### III.    EVENTS FOLLOWING THE HEARING

Later in the day on December 21, 2016, before the Rule to Show cause was entered into the record by the Clerk's office, the Court was copied on an email from the District Judge's Law Clerk to Ungarino and all counsel in the case that read as follows:

> Dear Mr. Ungarino,
>
> In response to your phone call today, I am informing you that the proper procedure of this court is for Judge North to first issue a ruling on the Rule to Show Cause on the Rule 11 Motion. Then, should you disagree with Judge North's ruling, you may appeal to Judge Zainey.  At this point in the process, however, **it would be premature for Judge Zainey to intervene.**  Please let me know if you have any questions.
>
> (Rec. doc. 49)(emphasis added).

Later that day, and shortly after the Minute Entry setting the Rule to Show Cause was entered in the record, Ungarino, apparently unaware the Minute Entry had been issued, replied to the aforementioned email:

> I am requesting a status conference before a rule to show cause is issued.  The emails with codef attys indicate that we requested that codef **counsel on October 4 confirm the domicile of defendants.  Codef Counsel signed the consent to remove subsequent to that email and the removal was filed.  This is unfair.  The emails should be reviewed before a rule to cause is issued.**

(*Id.*)(emphasis in original).

This Court took no action on these emails at the time except to have the Clerk's office enter them into the record.

Owing primarily to the receipt of the aforementioned emails, on December 27, 2016, the Court issued an Order supplementing the scheduled Rule to Show Cause, directing that in their brief responding to the Rule, Ungarino, Bordelon and U&E specifically address the following issues and explain therein why they and/or their law firm should not be sanctioned under 28 U.S.C. §§1927 and 1447 and/or Federal Rule of Civil Procedure 11 in connection with them:

1. Whether Mr. Ungarino knew when he signed the original Notice of Removal (the "Notice") that the notice did not contain sufficient jurisdictional facts as to the Poydras LLC defendants to support removal at that time.

2. Whether Mr. Ungarino or any attorney reviewing the proposed Notice knew that Fifth Circuit precedent required in this case that the Notice set forth the identity of the Poydras LLC members as well as their citizenship.

3. Whether Ungarino & Eckert actually inquired as to the identity and/or citizenship of the Poydras LLC members before filing the Notice.

4. Why Mr. Ungarino signed the Notice despite having "no personal knowledge of the citizenship of the co-defendants' clients"  (Rec. doc. 47).

5. The explanation for and details concerning the apparent *ex parte* communication with the District Judge's staff concerning this case on December 21, 2016.

(Rec. doc. 51).

IV.   **THE PARTIES' SUBMISSIONS IN ADVANCE OF THE HEARING ON THE RULE TO SHOW CAUSE**

A.   *The Poydras LLC Submission*

On January 3, 2017, counsel for Poydras LLC, Guyton Valdin, Jr. ("Valdin"), complied with the Court's order of December 21, 2016, providing the Court for *in camera* review numerous documents representing the written communications between his firm and U&E concerning removal issues, particularly the citizenship of Poydras LLC and its members.  The Court's review of those documents revealed what the Court had suspected after the original hearing:  not only did U&E fail to inquire about the Poydras LLC members' citizenship before it filed the Notice on October 5, 2016, it did not ask Valdin for that information for the first time until November 7, 2016 – *after* both Motions to Remand had been filed by Plaintiffs. (Rec. doc. 58-3).  As will be discussed below, the documents submitted by U&E with its memorandum confirmed this fact.

B.   *Ungarino & Eckert's Submission*

On January 6, 2017, U&E, through counsel, submitted its brief in connection with the Rule to Show Cause.  (Rec. doc. 55).  Simultaneously, and as ordered, U&E submitted, for *in camera* review, the documents it relied upon in drafting both the original and amended Notices of Removal.  The Court's *in camera* review of the documents submitted by both the Poydras Defendants and U&E reveal them to be virtually identical and the Court is satisfied it has received everything it ordered to be produced.  As noted above, the U&E submission confirms that U&E first requested the Poydras LLC membership information after Plaintiffs had filed their motions for remand.

Turning to U&E's arguments in brief against the imposition of sanctions, they can be fairly summarized with this language from the Introduction to their brief:

> Respondents recognize and admit they should have properly listed the citizenship of Poydras Center, LLC and Poydras Center Manager, Inc. in the original notice of removal or, in the alternative, should have amended the notice as soon as possible after removal to cure the defect.  While the removal was ultimately proper and complete diversity exists, Respondents further recognize and admit their failure caused unnecessary time and expense to be expended by plaintiffs' counsel and the Court and sincerely apologize to all involved for this wasted time and effort.  While Respondents accept full responsibility for their actions and inactions, these actions and inactions were due to inadvertence and oversight.  They were not taken in bad faith and their effects were not intended.

(Rec. doc. 55 at pp. 1-2).

The salient factual contentions set out in U&E's brief include the following:

- The firm's "Professional Responsibility Committee" was "aware of controlling U.S. Fifth Circuit precedent holding limited liability companies have the citizenship of their members."  (*Id.* at p. 3).

- The Committee did not "recognize the error" of not specifying the full membership of the LLC Defendants until after the motions to remand had been filed.  (*Id.*).

- Ungarino's statement to the Court that he had "no personal knowledge of the citizenship of the co-defendants' clients" was "imprecise language" meant to convey the idea that he could not ascertain the individual members' citizenship because he could not contact them personally.  (*Id.*).

- That "prior to the original removal, Respondents did not specifically inquire about the identity and/or citizenship of the members of the LLC Parties" and "to the extent Mr. Ungarino's statements at the hearing could be construed to suggest Respondents requested this information, such a reading would be inaccurate." (*Id.* at p. 7).

13

- That "[f]ollowing the hearing *and the minute entry*, Mr. Ungarino contacted the presiding district judge's chambers to request dates for a potential status conference regarding the motions to remand and the motion to amend. Mr. Ungarino spoke with Judge Zainey's law clerk to determine the potential available dates. Mr. Ungarino also asked the law clerk for her recollection as to whether Judge Zainey had indicated an intent to grant or deny the motion to amend at a status conference held on December 8, 2016. Other than these discussions, Mr. *Ungarino did not discuss the substance of the case, the merits of the case, or the pending motion.*" (*Id.* at p. 5)(emphasis added).

At the hearing on the Rule to Show Cause on January 18, 2016, the Court addressed each of these contentions.

## V.    THE HEARING ON THE RULE TO SHOW CAUSE

Having reviewed the pleadings filed by the parties and U&E and the documents submitted for *in camera* review prior to that hearing, the Court considered certain relevant facts to have been established based upon the then-extant record, including the following:

- U&E and its Committee knew that Fifth Circuit precedent required them to allege the identity and citizenship of the Poydras LLC members in order to effect a valid removal. (Rec. docs. 53 at p. 7; 55 at p. 3).

- Respondents "recognize[d] and admit[ted] they should have properly listed the citizenship" of the Poydras defendants and "recognize[d] and admit[ted] that their failure caused unnecessary time and expense to be expended by plaintiffs' counsel and the Court. . . ." (Rec. doc. 55 at pp. 1-2).

14

- Respondents first sought the LLC member information by email to Poydras LLC's counsel on November 7, 2016, after the initial removal and two motions to remand were filed.  (Rec. doc. 58-3).

- Ungarino signed the Notice of Removal without Respondents having inquired as to the identities or citizenship of the Poydras LLC members.

- At the conclusion of the December 21, 2016, this Court advised counsel that it would issue the Rule to Show Cause concerning possible sanctions to be assessed against Respondents for their improper removal of this matter.  (Rec. doc. 53 at p. 17).

- Following that hearing and before this Court issued a formal Minute Entry setting the Rule to Show Cause, Ungarino contacted the chambers of U.S. District Judge Jay C. Zainey and spoke to his law clerk regarding the impending Rule to Show Cause.  (Rec. doc. 49).

- Judge Zainey's clerk responded by sending an email to Ungarino, all counsel in the case and this Court advising Ungarino of the proper procedure for objecting to this Court's issuing of the Rule to Show Cause and stating that "[a]t this point in the process[] it would be premature for Judge Zainey to intervene."  (Rec. doc. 49).

- Shortly thereafter, Ungarino "replied to all" on that email, requesting a "status conference before a rule to show cause is issued."  (*Id.*).

Considering these facts to have been established in the record, the Court proceeded at the Show-Cause hearing to question Ungarino and Bordelon, individually and through

counsel,[8] on three salient issues:  (1) what the Court perceived as Ungarino's misrepresentations to the Court that his firm had been seeking the LLC members' identities and citizenship from co-Defendant's counsel "way in advance" of the removal and Bordelon's silence in the face of those misrepresentations, (2) Ungarino's *ex parte* attempt to exert improper influence on this Court and (3) the subsequent mischaracterizations about that *ex parte* communication in U&E's brief.  The Court addresses each issue separately below.

Before discussing what it viewed as Ungarino's misrepresentations concerning the timing of U&E's request for the LLC members' information, the Court shared its view that U&E had actually established to the Court's satisfaction that all four members of the Committee knew at the time of removal that Fifth Circuit law required that certain specific information be pleaded in the Notice.  This was so because Ungarino affirmatively stated that fact at the December 21 hearing and it was repeated – twice – in U&E's brief in advance of the Show-Cause hearing.  The Court was surprised, then, when U&E's counsel announced for the first time in the middle of the hearing that Bordelon – the lawyer actually tasked with effecting the removal – did not know the "specificity" required by the Fifth Circuit.  (Rec. doc. at p. 10).

It is frankly inconceivable how this simple fact of such obvious importance to the Court could be repeatedly misstated orally and in brief, only to be corrected at the hearing after the Court advised that it considered the matter settled.  The matter is not settled, thanks to U&E's constantly evolving version of the facts, a problem that permeates this entire matter, as will be seen below.

---

[8] Ungarino, Bordelon and U&E were capably represented at the hearing by Frank X. Neuner.

As for Ungarino's statements at the December 21 hearing that U&E had been seeking the LLC members' information since before the Notice was filed, the true facts are even murkier now than before.  In their brief, U&E attempted to explain that these misstatements did not actually occur:  "To the extent Mr. Ungarino's statements at the hearing could be construed to suggest Respondents requested [the LLC member] information, such a reading would be inaccurate."  (Rec. doc. 55 at p. 7 n. 3).  However, at the hearing, counsel for U&E – again for the very first time – conceded that Ungarino *had* made these statements, but that they were based on bad information or a mistaken assumption:  "And I think Mr. Ungarino misspoke and misunderstood the facts at the time that he was here, Judge."  (Rec. doc. 59 at 13).  Counsel then suggested Ungarino's "misspeaking" was the result of having his parents in from out of town, being unexpectedly ordered to attend the hearing while on vacation during the holiday season and therefore coming to court "probably not as prepared as hopefully I am today and he is today."  (*Id.*).  Counsel then asserted "[b]ut, Judge, you know good lawyers make mistakes and this was a mistake and I understand the Court's consternation because like I say, I've read the transcript and looking at where we are now versus where you were then" and apologized "if there was a misapprehension."  (*Id.* at p. 17).

In response to this news, the Court made two observations, the first being somewhat obvious – that counsel's announcement in court was the *first* time anyone had admitted that Ungarino "misspoke" at the December 21 hearing.  (*Id.* at p. 14).[9]  The second observation was that, while Ungarino was "mistakenly" misstating the timing of U&E's request for the LLC members' information, Bordelon – the person who actually requested it – sat in silence

---

[9]  This was the second – but not the last – statement made at the Show-Cause hearing that was directly at odds with something stated in U&E's brief.

and failed to correct Ungarino's misstatements.  Bordelon responded to this observation by insisting that he did not realize Ungarino's statements were wrong because "[h]onest to God [he] didn't remember" during the December 21 hearing when he first asked for the LLC member information (*Id.* at p. 16).

The Court was unsure enough about what was being argued at the hearing concerning the *actual* version of events that it sought confirmation that it understood counsel's position on behalf of Ungarino:

> THE COURT: And I think that is what I heard and I think that what Mr. Neuner has said is that Mr. Ungarino said those things mistakenly because he's not the one who was in charge of -- that's what I take their argument to be.
>
> MR. YOUNG: So I think that –
>
> THE COURT: Mr. Neuner can -- I know he was just talking to Mr. Ungarino –
>
> MR. YOUNG: Yeah.
>
> MR. NEUNER: I'm sorry, Judge.
>
> THE COURT: What I understand your -- Mr. Young just alluded to the fact that at the hearing there were numerous statements that Mr. Ungarino made that you all -- that they were looking for this specific information before the removal.  *And as I understand what you've told me today is that those statements were made mistakenly because Mr. Ungarino came in, I ordered him to be here, he didn't know the facts, and he misspoke.  That's how I understand what they're saying today.*

(*Id.* at p. 22)(emphasis added).

At that point, it was clear to the Court (and likely everyone present) that counsel was arguing that Ungarino's misstatements were the product of a misunderstanding of the background facts and were not made in bad faith or with knowledge that the statements

were wrong.  This was at least a plausible explanation for what were obviously incorrect statements made at the first hearing.

Then, in a mystifying turn of events, Ungarino decided to inform the Court that counsel's explanation for his statements was wrong and that, in fact, he *did not* make the statements his counsel had twice attributed to him earlier in the hearing because, in his words, "[o]n December 21, Judge, I knew for an absolute fact that we did not have a specific email asking for LLC membership parties." (*Id.* at p. 40).  This was the *third* separate time in one hearing that Ungarino, Bordelon or their counsel said something to the Court that flatly contradicted something they had said earlier, and this particular reversal occurred, not when Ungarino's attorney was actually explaining the sequence of events as he understood them or in response to the Court's restatement of that position but at the very end of the hearing, after the Court had indicated it was going to issue a separate Order and Reasons and had not yet decided how it was going to rule on the various issues.  (*Id.* at pp. 37-39).  And, true to form, rather than take some responsibility for his misstatements (as counsel had apparently tried to do on his behalf), Ungarino doubled down on the idea that the Court had somehow misunderstood what he was trying to explain at the December 21 hearing.  It suffices here to say that is not what happened.

The Court moved on at the hearing to address the serious matter of Ungarino's admitted *ex parte* conversation with the District Judge's law clerk, as well as the subsequent mischaracterizations in U&E's brief concerning the content of that improper conversation. The Court first confronted Ungarino with the fact that his brief clearly misstated that the *ex parte* discussion took place after this Court's Show-Cause Minute Entry was issued.  That was

a false statement, which Ungarino was forced to admit, based upon the record of the case. (*Id.* at p. 33).

The Court then inquired whether, contrary to the statements made about the *ex parte* conversation in U&E's brief, Ungarino did in fact speak to Judge Zainey's clerk about the Rule to Show-Cause Minute Entry and attempt to have Judge Zainey "intervene" to prevent or delay this Court from issuing such a Minute Entry.  His responses hardly cleared things up:

> THE COURT:  Did you discuss this motion with her?
>
> MR. UNGARINO:  Discuss which motion?
>
> THE COURT:  The pending motion, the Rule to Show Cause and the Motion for Leave to Amend, which had not been ruled on.
>
> MR. UNGARINO:  *Judge, honestly I don't remember.*  All I wanted was an immediate status conference with the Judge.
>
> (*Id.* at p. 31)(emphasis added).

It is worth noting here that Ungarino's brief stated categorically – twice – that he "did not discuss the substance of the case, the merits of the case, or the pending motion" with Judge Zainey's clerk.  (Rec. doc. 55, pp. 5, 9).  One is left to wonder how those affirmative statements found their way into the brief when Ungarino claimed later to "honestly [not] remember" what he discussed.

The colloquy continued:

> THE COURT: Did you speak to Judge Zainey's clerk about having the Judge intervene to prevent me or delay me from issuing the Rule to Show Cause that I said in court I was going to issue? That's my question.
>
> MR. UNGARINO: I asked for a status conference to talk about the remand, show cause, Motion to Amend, yes.

THE COURT: Did you talk to her about having Judge Zainey intervene to stop me from issuing the Rule to Show Cause? That's my question.

MR. UNGARINO: Judge, I don't remember that specifically, no. Honestly, Judge, I did talk about the show cause order.  I don't know if those words were specifically used.

(<em>Id.</em> at p. 34).

So to summarize, at this point in the proceedings, the Court had to choose from the following menu of options (listed in the chronology in which they were offered):   (1) Ungarino discussed the Rule to Show Cause and asked the District Judge to intervene before it was issued (rec. doc. 49); (2) Ungarino did not discuss the Rule to Show Cause (rec. doc. 55); (3) Ungarino "honestly" does not remember whether he discussed the Rule to Show Cause (rec. doc. 59 at p. 31); and (4) Ungarino "did talk about the rule to show cause" but does not remember asking Judge Zainey to intervene to have it stopped.  (<em>Id.</em> at p. 34).

To describe Ungarino's responses to this Court's rather direct questions as "evasive" would be far too generous.

## VI.    DISCUSSION OF THE ISSUES

At the outset of these proceedings, this Court was concerned only with what appeared to be yet another hasty and improper removal by U&E, which the firm only sought to remedy after the Plaintiffs each were forced to file motions to remand.  That concern only deepened during the December 21 hearing, based upon a number of things said by Ungarino.  For this reason, the Court held in abeyance a ruling on the merits of Velocity's Motion and scheduled a Show-Cause hearing to explore whether any of the Respondents should be sanctioned for improperly removing the case in the first place and whether their conduct potentially impacted the question whether leave to amend the Notice should be granted.

In the course of attempting to resolve these two issues, the Court has been confronted with ever-multiplying versions of the facts and a confounding course of conduct by Ungarino that it now has no choice but to address.  The additional issues raised by that conduct are: (1) evidence that Ungarino and Bordelon misrepresented material facts at the December 21 hearing concerning the timing of their investigation of jurisdictional facts; (2) Ungarino's improper *ex parte* communications with the District Judge's chambers in an ill-advised attempt to prevent or delay the issuance of an order from this Court and (3) Ungarino's misrepresentations as to the purpose and content of those *ex parte* communications.  The Court will address all of these issues in order, after first addressing the underlying Motion seeking to amend the original Notice of Removal.

   A.   *Whether the Proposed Amendment of the Original Notice of Removal Should Be Allowed*

Given the developments in this matter, it is not without irony that the Court finds that Velocity's Motion for Leave to File Amended Notice of Removal should be granted.

This entire saga arises from attorney misconduct; there is no evidence anywhere in the record that Velocity had any knowledge of what was happening (or not happening) at U&E with regard to the removal of this case or subsequently.  The Court has located no authority that would support denying leave to amend the Notice solely for the misconduct of counsel, particularly where leave is otherwise freely given under 28 U.S.C. §1653 and it appears that the Defendants and their members are, indeed, diverse (notwithstanding the question of fraudulent joinder vis-à-vis Mr. Schloegel, which is not before this Court).

Plaintiffs' counsel has creatively argued that U&E's tactics effected a "provisional" removal that impermissibly extended the 30-day deadline for removal under §1446, but that argument is undermined by the plain text of §1653 and the cases interpreting it that clearly

direct that leave should be granted to correct the very type of deficiencies present in this case.  While the Court is not insensitive to the fact that U&E's admittedly premature removal wasted the litigants' time and has delayed prosecution of this case, it cannot justify denying Velocity's request to correct the deficiencies apparent in the jurisdictional allegations of the Notice.

Accordingly, the Court grants Velocity's Motion for Leave to Amend the Notice. However, as noted in open court at both hearings, the Court cautions Velocity that the proposed amended Notice that is in the record and attached to its motion (rec. doc. 38-5) is the version that will be filed into the record in this case and no additional amendments will be allowed.

B.   *Whether Respondents Should Be Sanctioned for Improper Removal of the Case*

Based upon the record evidence and statements made at both hearings, the Court finds that Ungarino, Bordelon and U&E (through its Committee formed for the purpose of insuring against improper removals) failed to conduct a reasonable inquiry under the circumstances prior to removing this case and that their failure merits sanctions under Rule 11.[10]

The pertinent provisions of Rule 11 provide:

> (b) Representations to the Court.  By presenting to the court a pleading, written motion, or other paper--whether by signing, filing, submitting, or later advocating it--an attorney or unrepresented party certifies that to the best of the person's knowledge, information, and belief, *formed after an inquiry reasonable under the circumstances*:
>
> > (1) it is not being presented for any improper purpose, such as to harass, cause unnecessary

---

[10]  The Court has also considered whether sanctions would be appropriate under 28 U.S.C. §§1927 and 1447(c) and finds that they are not.

delay, or needlessly increase the cost of litigation;

(2) the claims, defenses, and other legal contentions are warranted by existing law or by a nonfrivolous argument for extending, modifying, or reversing existing law or for establishing new law;

(3) the factual contentions have evidentiary support or, if specifically so identified, will likely have evidentiary support after a reasonable opportunity for further investigation or discovery; and

(4) the denials of factual contentions are warranted on the evidence or, if specifically so identified, are reasonably based on belief or a lack of information.

(c) Sanctions.

(1) In General. If, after notice and a reasonable opportunity to respond, the court determines that Rule 11(b) has been violated, *the court may impose an appropriate sanction on any attorney, law firm, or party that violated the rule or is responsible for the violation.* Absent exceptional circumstances, a law firm must be held jointly responsible for a violation committed by its partner, associate, or employee.

. . . .

(3) On the Court's Initiative. On its own, the court may order an attorney, law firm, or party to show cause why conduct specifically described in the order has not violated Rule 11(b).

(4) Nature of a Sanction. A sanction imposed under this rule must be limited to what suffices to deter repetition of the conduct or comparable conduct by others similarly situated. The sanction may include nonmonetary directives; an order to pay a penalty into court; or,

> if imposed on motion and warranted for effective
> deterrence, an order directing payment to the
> movant of part or all of the reasonable attorney's
> fees and other expenses directly resulting from
> the violation.

**Fed. Rule Civ. P. 11**
(emphasis added).

The focus of the Court's Rule 11 analysis is the adequacy of the original Notice of Removal.  There is no question but that the original Notice was incomplete and improper under Fifth Circuit precedent, a fact admitted by U&E.  *See Harvey v. Grey Wolf Drilling*, 542 F.3d 1077 (5th Cir. 2008).  The Fifth Circuit clearly and unequivocally stated in *Harvey* that:

> Supreme Court precedent, case law from other circuits, and the
> statutory language of both Section 1332 and Louisiana Revised
> Statutes § 12:1301(a)(10) overwhelmingly support the position
> that a LLC should not be treated as a corporation for purposes
> of diversity jurisdiction.  Rather, *the citizenship of [an] LLC is
> determined by the citizenship of all of its members.*

(*Id.*)(emphasis added).

Accordingly, it is not possible to allege diversity as to an LLC without identifying its members and alleging their citizenship.  Ungarino and U&E knew this, knew they did not possess that information, but chose to remove the case anyway.  In fact, despite Ungarino's attempts to convince the Court otherwise, U&E failed to even ask for that information until *after* they had removed the case.  This conduct by a firm with U&E's lengthy history of improvident removals was objectively unreasonable.

Ungarino vigorously complained at the December 21 hearing that the system, with its 30-day deadline for removals, is unfair and that his "hands were tied" by that deadline and his inability to timely obtain the required information from co-counsel.  Those complaints ring hollow.  The statutory scheme is what it is and lawyers – especially lawyers with U&E's

robust history of improper removals – cannot simply determine to act outside that scheme at their whim.  Indeed, in a prior instance in which U&E was admonished and sanctioned for improperly removing a case and was expressly advised:

> If the removing defendant does not have facts sufficient to support removal when the original petition is received, it is the removing defendant's responsibility to discover those facts before effecting removal.  That is precisely why the [one-year] "other paper" removal rule exists, to ensure that removals will not be filed "before their factual basis can be proven [by the removing defendant] by a preponderance of the evidence...."  That was clearly not done in this case.  To the contrary, Granite filed a "bare bones" Notice of Removal and *thereafter attempted to discover the facts supporting its pleading*.

> *Fontenot v. Granite State Ins. Co.*, No. 08-CV-1296,
> 2008 WL 4822283 at *5 (W.D. La Nov. 3, 2008)
> (emphasis added)(internal citation omitted).

In essence, that is exactly what U&E did here, even after having been admonished and sanctioned for exactly the same sort of slipshod conduct in removing cases numerous times in the past.  It removed the case without any knowledge of the identity or citizenship of the Poydras LLC members and the evidence produced at the hearing demonstrates that the firm only sought to discover that information *after* the removal.  This was not merely a failure to conduct a *reasonable* inquiry under Rule 11, it was a failure to conduct *any* inquiry, despite the professed knowledge of the lawyers that such an inquiry was required.

In its brief filed in connection with the Show-Cause hearing, U&E admit that "their investigation could have been and should have been more thorough into the precise citizenship of the LLC Parties and that they should have specifically asked for the identity and citizenship of the LLC Parties" and apologized for failing to do so.  (Rec. doc. 55 at p. 14).  They go on to cite their acknowledgement and contrition to suggest that monetary sanctions under Rule 11 are not "necessary to further deter Respondents' failures as *Respondents have*

*admitted these failures and take full responsibility for their shortcomings.*"  (*Id.*)(emphasis added).

The Court finds this so-called acknowledgment and apology by U&E for its "shortcomings" to be hollow and insincere and they come far too late in these proceedings to have any effect.  The acknowledgment and apology were only forthcoming *after* Ungarino failed to change the course of events by his repeated complaints of unfairness, his *ex parte* communication with the Court and his last-minute email to the Court seeking to have the District Judge intervene.  It could not be more obvious to the Court that U&E's ostensible acceptance of responsibility is actually just a last-ditch strategy to avoid the consequence of its actions (and inactions).[11]

Based on all of the foregoing, then, the Court finds that sanctions under Rule 11 are appropriate here against U&E for the waste of judicial resources occasioned by its failure to investigate material jurisdictional facts in advance of removing this case.

The Court has given serious consideration to the question of the type of sanction that is most appropriate in this case.  In seeking to craft the "least severe sanction adequate to serve" the deterrent purposes of Rule 11 in this case,[12] this Court cannot fail to consider the lengthy history of this law firm, and Ungarino in particular, with regard to improper removals.  That history is simply unprecedented in this Court's view and must be considered in the fashioning of an appropriate sanction.

In this regard, the Fifth Circuit has advised:

---

[11]  Indeed, this strategy has been employed by the firm in similar circumstances in the past – as cited above, it appears to have saved the firm from a much more draconian sanction than that ultimately imposed by Judge Melancon in *Hollier.*
[12]  *Thompson v. Capital Sec. Servs., Inc.*, 836 F.2d 866 (5th Cir. 1988).

27

> [w]hat is "appropriate" may be a warm friendly discussion on
> the record, a hard-nosed reprimand in open court, compulsory
> legal education, monetary sanctions, or other measures
> appropriate to the circumstances. Whatever the ultimate
> sanction imposed, the district court should utilize the sanction
> that furthers the purposes of Rule 11 and is the least severe
> sanction adequate to such purpose.

*Thompson*, 836 F.2d at 878.

The Court has considered a plethora of options and concludes, based upon all the circumstances, that a monetary sanction is appropriate here and will order that such a sanction, as calculated below, be paid to the Office of the Clerk of Court for the Eastern District of Louisiana.  While the Court considered a fee-shifting sanction, and Plaintiffs' counsel were directed to file briefs that addressed a potential award of fees and/or costs occasioned by the improper removal, only counsel for the Nogess Plaintiffs submitted anything and that submission was inadequate to support any award of fees and costs against U&E.  (Rec. doc. 57).  The fees and costs "requested" by counsel are not supported by any documentation or affidavit and, in fact, are not even added together to arrive at a comprehensible figure.  (*Id.*).  The Court will not waste any more time on this matter by undertaking to do the math required to arrive at a suitable figure and therefore declines to award any fees or costs to Plaintiffs' counsel as a sanction against U&E.

However, the waste of time and resources admittedly caused by U&E's conduct[13] cannot not go un-addressed simply because Plaintiffs' submission was lacking.  The matter of the "value" of a federal court's time for purposes of assessing sanctions against a litigant or lawyer for wasting that time has been the subject of discussion in a number of courts over the years.  In a 1982 study sponsored by the Rand Corporation Institute for Civil Justice, it

---

[13]  Rec. doc. 55 at p. 2.

was concluded that a single hour spent by a federal judge in a tort case cost the government approximately $600 in 1982.  *See Levin & Colliers, Containing the Cost of Litigation*, 37 **Rutgers L. Rev.** 219, 219–22 (1985).  That calculation has been approved and adopted by numerous courts since.  *See, e.g., Lapin v. U.S.*, 118 F.R.D. 632 (D. Hawaii 1987); *Thiel v. First Federal Savings & Loan Ass'n of Marion*, 646 F.Supp. 592, 598 (N.D. Ind. 1986), *aff'd in part dis'd in part*, 828 F.2d 21 (7th Cir. 1987)(imposing a sanction of $3,600 based upon $600 per hour); *Dyson v. Sposeep*, 637 F.Supp. 616 (N.D. Ind. 1986)(using the $600/hour formula and stating it would also be used in the future); *Advo Sys., Inc. v. Walters*, 110 F.R.D. 426 (E.D. Mich. 1986)(noting that the court cannot tolerate an unnecessary drain on judicial resources caused by actions without merit and that in future cases the $600 per hour formula would be used to impose sanctions).  With the passage of time, other courts have continued to employ this formula, adjusting the hourly rate for inflation.  *See, e.g., Seneca Res. Corp. v. Moody*, 135 B.R. 260 (Bkrtcy. S.D. Tex. 1991)(imposing Rule 11 sanctions at $890 per hour); *Enright v. Auto–Owners Ins. Co.*, 2 F.Supp.2d 1072, 1076 n. 2 (N.D. Ind. 1998)(adjusting the rate to $900 per hour); *International Union of Electronic, Electrical, Salaried, Machine & Furniture Workers (AFL–CIO), Local 84907 v. Visteon Systems, LLC*, No. 06-CV-275, 2007 WL 647499 (S.D. Ind. 2007)(same).

Most recently, in a 2012 decision citing to the foregoing authority, a court employed the United States Department of Labor, Bureau of Labor Statistics, Consumer Price Index Inflation Calculator ("CPI Calculator") to calculate that the $600-per-hour rate in 1982 should be adjusted to $1,430.58 in 2012.  *In re Kentwood Pharmacy, L.L.C.*, 475 B.R. 602 (Bkrtcy. W.D. Mich. 2012)(citing CPI calculator, found on the web at bls.gov/data/inflation_calculator.htm).

This Court finds the foregoing formula and reasoning persuasive in these circumstances. Employing the CPI Calculator, the Court finds that an hour of its time in 2016 is worth $1,500 (rounded down from $1,500.64). Although the Court has expended *substantially* more than three hours on this matter to this point, it will assess a sanction against U&E[14] for its violation of Rule 11 in the amount of $4,500 representing the unnecessary expenditure of three hours of the Court's time in reviewing and ruling on Velocity's Motion for Leave to Amend its Notice of Removal and conducting two hearings occasioned by U&E's failure to conduct a reasonable inquiry into the jurisdictional facts of the case prior to removing it.

### C.   Whether Additional Sanctions or Discipline Are Warranted

One of the reasons the Court scheduled the Show-Cause hearing was because it was concerned that Ungarino had misrepresented a material fact during the December 21 hearing, namely that his firm had been asking counsel for Poydras LLC for the missing members' information *"way in advance"* of the removal and that his "hands were tied" because Poydras' counsel would not respond before the 30-day deadline to remove the case arrived. (Rec. doc. 53 at p. 10)(emphasis added). It is now apparent to the Court that Ungarino knowingly misrepresented these "facts" in an attempt to excuse the faulty removal.

---

[14] The Advisory Committee Notes to the 1993 Amendment to Rule 11 provide:

> The sanction should be imposed on the persons--whether attorneys, law firms, or parties--who have violated the rule or who may be determined to be responsible for the violation. The person signing, filing, submitting, or advocating a document has a nondelegable responsibility to the court, and in most situations is the person to be sanctioned for a violation. Absent exceptional circumstances, a law firm is to be held also responsible when, as a result of a motion under subdivision (c)(1)(A), one of its partners, associates, or employees is determined to have violated the rule.

After establishing at the December 21 hearing that the Committee knew it was required to allege the LLC members' identity and citizenship and nevertheless removed the case without that information, the Court expressed concern that this was the latest instance of U&E "rushing to remove" a case without a factual basis for doing so:

> [THE COURT]:  So this *rush to remove the case* without the necessary facts to support the removal is not harmless.  That's the problem I'm having.
>
> MR. UNGARINO:  Judge, if we're talking about a timing issue, then you'd have to then -- we'd have to then defer to our e-mails to Guy Valdin where *we were asking for this information way in advance.*  This was not a rush -- it ended up being a rush at the end, but, remember, Judge, our hands are tied.  Guy Valdin's client [Poydras LLC] has the answers, we don't.

(Rec. doc. 53 at p. 10)(emphasis added).

This statement cannot be read as anything other than a false excuse for not including required facts in the original Notice.  If there could be any confusion as to Ungarino's meaning, he reiterated a short time later:

> THE COURT: You wouldn't have to argue about fraudulent joinder because you don't have the necessary jurisdictional allegations on the membership of the LLCs [in the original Notice].
>
> MR. UNGARINO: Judge -- and now I understand.  I understand your concern.
>
> But to be fair, Judge, it's a little tough on us when we don't control.  So I can send Guy Valdin -- and if the Court wants me to, I will do it in camera.  We can show you our time sheets, our e-mails, et cetera, where *we're asking for the information and we're not getting it.*

(*Id.* at pp. 11-12)(emphasis added)

31

The Court does not accept Ungarino's strange, last-ditch attempt to distance himself, not only from the clear statements he made at the December 21 hearing, but from *his own lawyer's* admission that he (Ungarino) actually made those statements, albeit under a mistaken assumption.  Counsel's explanation for Ungarino's misstatements of fact was at least plausible, given that Ungarino himself was not intimately involved in gathering the information to remove the case.  Ungarino's disavowal of his own attorney's saving explanation and admission that he *knew what he was telling the Court was wrong* is not only bizarre, it lacks any credibility.

Ungarino either "misspoke," "misunderstood the facts" and made a "mistake" (as his lawyer argued) or he did not.  He either acted recklessly or he acted intentionally.  The Court was prepared to accept that it was the former, until Ungarino spoke at the hearing and confirmed it was the latter.  The Court now harbors no doubt that it was Ungarino's intention to convince it that the improper removal should be excused because his firm was trying unsuccessfully to obtain the information from his co-Defendant and was running up against the 30-day deadline.  The record and statements by Ungarino establish to this Court's satisfaction that Ungarino knowingly attempted to mislead this Court at the December 21 hearing.[15]

As for the matter of the *ex parte* communications with the District Judge's chambers, the Court easily finds that the communication itself was improper.  This finding is based, not only on the mere fact that it happened, but on the contents of the email exchange discussed

---

[15] It is difficult to overstate this Court's frustration with the ever-changing explanations, excuses and versions of events offered throughout these proceedings by U&E to explain their conduct.  The Court has been given competing versions of facts surrounding whether U&E attempted to obtain the LLC membership information prior to removal; whether Bordelon knew the law regarding diversity of LLCs; whether Ungarino's *ex parte* communication with the court occurred before or after this Court's Show-Cause Minute Entry was issued; and whether Ungarino discussed the Show-Cause Minute Entry with Judge Zainey's clerk.

above, which depict an attempt by Ungarino to have the District Judge intervene to prevent or delay the issuance of this Court's Minute Entry scheduling the Rule to Show Cause. (Rec. doc. 49). Moreover, the Court finds that Ungarino compounded his ethical lapse by grossly mischaracterizing the contents of that conversation in brief and then evading the truth when questioned directly about the matter at the Show-Cause hearing.

As for the statement in brief that the *ex parte* conversation took place after the Court issued its Show-Cause Minute Entry, counsel for U&E attempted at the hearing to take responsibility for that "error," but the Court does not believe that is where responsibility lies. That information could only have come from Ungarino and the Court finds it inconceivable that such an error could make its way into U&E's brief without coming to Ungarino's attention first. It is also hardly isolated, given the other untrue and misleading statements made by Ungarino in this matter.

And as far as Ungarino's continuing deflection upon repeated questioning by this Court as to the contents of the *ex parte* conversation, the Court simply observes that it is convinced that Ungarino initiated that call for the sole purpose of trying to have the District Judge intervene in the matter and that any denial of that fact by him is not to be believed.

This District's Local Rules provide, in pertinent part: (1) "[t]his court hereby adopts the Rules of Professional Conduct of the Louisiana State Bar Association, except as otherwise provided by a specific rule or general order of a court," E.D. La. LR 83.2.3; (2) that "every attorney permitted to practice in this court must be familiar with these rules," LR 83.2.7 and (3) that "[w]illful failure to comply with the rules, or a false certificate of compliance, is cause for disciplinary action." *Id.*

In turn, the pertinent Louisiana Rules of Professional Conduct require candor toward the tribunal; fairness to opposing parties and counsel; truthfulness in statements to others; avoidance of conduct involving dishonesty, fraud, deceit or misrepresentations; avoidance of conduct that is prejudicial to the administration of justice; and avoidance of *ex parte* communications or other attempts to influence a judge during the proceeding unless authorized to do so by law or court order.  *See* La. Rules Prof. Cond. 3.3, 3.4, 3.5, 8.4.

The above-referenced filings and statements in open court by Ungarino and his admitted attempts at *ex parte* communications with the presiding District Judge in an attempt to forestall this Court's issuance of the Rule to Show Cause establish to this Court's satisfaction that one or more of the foregoing rules were violated by Ungarino, whose conduct creates sufficient and serious concerns regarding his fitness to practice in this District.  Accordingly, it is hereby ordered that the matter of further discipline, if any, as to Matthew Ungarino is hereby referred by this Court to the Eastern District of Louisiana's Lawyers' Disciplinary Enforcement Committee for further investigation and proceedings and, if warranted, discipline.

At this time, the Court does not find that additional sanctions or discipline, including reference to the Disciplinary Enforcement Committee, are warranted as to David Bordelon.

### VII.    CONCLUSION

The Motion for Leave to File Amended Notice of Removal (rec. doc. 38) is **GRANTED** and the amended Notice submitted as an attachment to that Motion (rec. doc. 38-5) will be filed into the record.

The law firm Ungarino & Eckert is hereby **SANCTIONED** under Rule 11 for failure to conduct a reasonable inquiry under the circumstances prior to removing this case.  No later

than **15 DAYS** after entry of this Order and Reasons, U&E is to pay to the Clerk of the Eastern District of Louisiana the sum of $4,500.

It is further **ORDERED** that that the matter of additional discipline, if any, as to Matthew J. Ungarino is hereby referred by this Court to the Eastern District of Louisiana's Lawyers' Disciplinary Enforcement Committee for further investigation and proceedings and, if warranted, discipline.  A copy of this Order and Reasons will be forwarded to that Committee.

New Orleans, Louisiana, this <u>27th</u> day of _____ January _____, 2017.

<u>_____</u>
MICHAEL B. NORTH
UNITED STATES MAGISTRATE JUDGE